**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CR. No. 06-130-01S** |
| | : | |
| **JEFFRA DEJESUS** | : | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

## INTRODUCTION

The defendant contends that the Court should suppress all evidence obtained as result of the defendant's arrest on the grounds that law enforcement officers seized both the defendant and evidence in violation of the Fourth Amendment of the United States Constitution. The defendant's arguments are without merit.

## FACTS

On October 31, 2006, Task Force Agent (TFA) Michael Naylor, with the Drug Enforcement Administration (DEA) Taskforce, received information from a cooperating source (CS) that the defendant would be delivering a kilogram of cocaine to a residence on Alto Street at 3:00 pm. He also told TFA Naylor that the defendant had another kilogram of cocaine. The CS said the defendant would deliver one kilogram of cocaine in the defendant's vehicle which had a license plate of GJ-345. He also told TFA Naylor that the defendant would have another male with him to "have his back."

From past experience, TFA Naylor knew the CS to be a reliable source of information. Information from the CS has lead to the arrest and conviction of at least 10 suspects on both federal and state charges. Additionally, the CS has testified under oath before.

The information TFA Naylor received from the CS on October 31, 2006 was corroborated by information that TFA Naylor had been receiving over the previous two months. Namely, that an individual known as "Bori," sells kilogram quantities of cocaine and sells marihuana. From the information received, TFA Naylor was able to identify "Bori" as the defendant, Jeffra DeJesus, and identify the vehicle operated by and registered to the defendant.

On October 31, 2006, after receiving the information from the CS, TFA Naylor requested that a Cranston police cruiser conduct a car stop of the defendant, who was traveling in his vehicle with the plate GJ-345. Officer Davis, with the Cranston Police Department, pulled behind the defendant in a marked cruiser, and Detective Paul Saccoccia pulled his unmarked car in front of the defendant's car. Officer Davis activated his lights and attempted to stop the defendant. The defendant, however, accelerated and tried to evade Officer Davis by maneuvering around Detective Saccoccia's vehicle. The defendant was not able to get around Detective Saccoccia's vehicle and was forced to stop.

As the officers approached the vehicle, the defendant and his "back-up," Alan DeJesus-Quinones, were removed from the vehicle, handcuffed and asked to sit on the curb. Detective Saccoccia looked through the window and saw a blue bag pulled tightly around what appeared to be a brick of narcotics. The brick was laying on the floor behind the passenger seat. Detective Saccoccia seized the brick, discovered that it did in fact contain cocaine and placed the defendant and Alan DeJesus-Quinones under arrest.

During a search of the vehicle, the officers located a hidden compartment in the dashboard which contained 17 bags of cocaine. They also seized five cell phones from the vehicle.

The DEA agents arrived shortly after the vehicle stop. TFA Naylor read the defendant his Miranda rights, and began to question the defendant. The defendant admitted that he was on his way to deliver a kilogram of cocaine. The defendant also admitted that he left his residence at 66 Osborn Street to make this delivery. He then gave the agents consent to search his house as long as he could accompany them back to his house. He told the agents he had the keys to the house on his key ring in the car. The keys were seized and later used to gain entry to the defendant's house.

During a search of the house, the defendant directed TFA Naylor to the bathroom where a gun was hidden. TFA Naylor was

unable to find the gun, but then another TFA discovered a secret compartment behind the medicine cabinet. Inside this compartment, the agents found cash, ammunition and a revolver with an obliterated serial number.

While transporting the defendant back to the police station, the defendant made admissions to TFA Naylor. Once back at the station, the defendant waived his Miranda rights for the second time that day. He then made even more admissions regarding his drug dealing.

The defendant now moves to suppress all evidence seized and all statements made by him to law enforcement.

## ARGUMENT

### I. THE POLICE LAWFULLY STOPPED AND DETAINED THE DEFENDANT.

The defendant argues that the initial stop of his motor vehicle and his subsequent detention by the officers and agents was unlawful; however, the officers' and agents' actions constituted a valid stop and detention based upon the existence of probable cause, or at least reasonable suspicion, to believe that the defendant possessed contraband at that time.

**A. The Agents Had Probable Cause to Believe That the Defendant Possessed Contraband at the Time of the Motor Vehicle Stop.**

Probable cause for a warrantless arrest exists if the collective knowledge[1] of the officers involved was sufficient to lead a prudent person to believe that the defendant was committing or had committed an offense. United States v. Link, 238 F.3d 106, 109 (1st Cir. 2001). Probability, not proof beyond a reasonable doubt, is the touchstone of the probable cause determination. See United States v. Aguirre, 839 F.2d 854, 857-58 (1st Cir. 1988). Thus, the officer's conclusion need not be "ironclad," or "even highly probable." See Winchenbach, 197 F.3d at 555-56. Rather, the arrest is justified if the circumstances known at the time support the officer's reasonable belief that the action taken was appropriate. Logue v. Dore, 103 F.3d 1040, 1044 (1st Cir. 1997).

Where, as here, the probable cause determination relied upon informant information, the Court must conduct a totality of the circumstances analysis when determining if that information establishes probable cause to arrest. Illinois v. Gates, 462 U.S. 213 (1983). Several factors to be considered in making that determination are the informant's past performance and

---

[1] In following the collective knowledge rule, the Court should consider the aggregate information available to all officers involved in the investigation when determining what was known by the officers at a particular time. See United States v. Winchenbach,197 F.3d 548, 555 (1st Cir. 1999).

relationship to authorities, the officer's attempts to corroborate the information provided, the informant's basis of knowledge, and law enforcement's experience and expertise in reaching conclusions from the informant's information. See United States v. Barnard, 299 F.3d 90, 93-95 (1st Cir. 2002)(explaining when an informant's information sustains a magistrate's finding of probable cause in the context of a search warrant); see also United States v. Khounsavanh, 113 F.3d 279, 284-87 (1st Cir. 1997).

The officers must attempt to corroborate an informant's information under the totality of the circumstances. United States v. Capozzi, 347 F.3d 327, 333 (1st Cir. 2003), cert. denied, 540 U.S. 1168 (2004). That corroboration, however, must be sufficient to only reduce, not wholly eliminate, the probability that the informer is either lying or inaccurate. Khounsavanh, 113 F.3d at 284. Moreover, the more reliable the informant, the less corroboration needed to sustain a finding of probable cause. See id.; see also United States v. Sandoval-Espana, 459 F.Supp.2d 121, 131 (D.R.I. 2006).

In this case, the CS was known to TFA Naylor. The CS began working with DEA several years prior to the day in question, and had provided reliable information numerous times in the past. While working for DEA, the CS's information resulted in the arrest or conviction of more than ten people. Furthermore, the

CS testified truthfully in the trial of at least one of those individuals. Also, the CS served as one of the sources underlying an affidavit supporting an application for a wiretap. In short, by the time the CS provided information to TFA Naylor on October 31, 2006, the CS had proven himself time and again to be a reliable informant.

Additionally, the CS demonstrated a solid basis of knowledge when the CS relayed the information to TFA Naylor. The CS personally spoke with the defendant on October 31, 2006, and knew the defendant would be delivering a kilogram of cocaine because the CS had agreed to purchase the kilogram of cocaine from the defendant.

The CS also provided information with enough detail so as to enhance the reliability of that information. The CS identified the vehicle in which the defendant would travel, the number of occupants that would be in the vehicle, the reason the defendant would have a second person with him, the quantity of cocaine the defendant would deliver, the time it would be delivered and the location of the delivery. Furthermore, the information TFA Naylor had received about the defendant over the previous two months corroborated the information TFA Naylor received from the CS on October 31, 2006[2].

---

[2]TFA Naylor had received information that the defendant was a cocaine dealer. Upon receipt of that information the agents were able to identify the defendant's vehicle.

Most significantly, however, the defendant's actions on October 31, 2006 corroborated the information received from the CS. See Draper v. United States, 358 U.S. 307, 313 (1959) (agents had probable cause to arrest based upon specific, detailed information from a known, reliable informant, who predicted the defendant's actions). Namely, that the defendant would be traveling, with a companion to "watch his back," to Alto Street, at 3:00 pm, in a particular vehicle. Just as in Draper, all the CS said would happen leading up to the traffic stop did happen. It is not inconceivable that the last piece of information - that the defendant had a kilogram of cocaine - would also prove to be true. This seemed even more likely after the defendant attempted to evade the officers' efforts to stop his vehicle. See Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("Headlong flight - wherever it occurs - is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.").

**B. Even if the Court Finds That the Agents did not Have Probable Cause to Arrest, the Stop of the Defendant's Vehicle was Supported by Reasonable Suspicion.**

Pursuant to Terry v. Ohio, "'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.'" United States v. Trueber, 238 F.3d 79, 91 (1st Cir. 2001)

(quoting Terry, 398 U.S. 1, 22 (1968) (internal quotations and citations omitted)). The officer may "stop and briefly detain the person for investigative purposes, and diligently pursue a means of investigation likely to confirm or dispel [his] suspicions quickly." Id. These "investigatory powers include stopping motor vehicles upon reasonable suspicion." United States v. Taylor, 162 F.3d 12, 17 (1st Cir. 1998) (citing Michigan v. Long, 463 U.S. 1032, 1049 (1983)). The validity of such Terry stops is governed by a two prong test: "whether the officer's actions were justified at their inception," and, if so, whether the actions taken by the officers following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop. Taylor, 162 F.3d at 18; United States v. Jackson, 918 F.2d 236, 238-39 (1st Cir. 1990).

To satisfy the test's first prong, "'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.'" Taylor, 162 F.3d at 18 (quoting United States v. Kimball, 25 F.3d 1, 6 (1st Cir. 1994)) (quoting Terry, 392 U.S. at 21). Put another way, "[w]arrantless investigatory stops are allowable if, and to the extent that, police officers have a reasonable suspicion of wrongdoing - a suspicion that finds expression in specific, articulable reasons

for believing that a person may be connected to the commission of a particular crime." United States v. Lee, 317 F.3d 26, 31 (1st Cir.) (citing Terry, 392 U.S. at 21), cert. denied, 538 U.S. 1048 (2003).

The reasonable suspicion required for a Terry stop may be based on information received from an informant known to the police as well as from an informant whose identity is unknown. Alabama v. White, 496 U.S. 325 (1990); Taylor, 162 F.3d at 19. When a credible informant warns of a specific pending crime, the police should be able to respond appropriately, i.e., to conduct a brief investigatory stop and detention of the suspect. Adams v. Williams, 407 U.S. 143, 147-148 (1972). Therefore, the test becomes whether a prudent law enforcement officer would reasonably conclude based upon the informant's information, as well as any available corroboration, that the likelihood existed that the suspect was probably engaged in criminal activity. See United States v. Diallo, 29 F.3d 23, 26 (1st Cir. 1994) (quoting United States v. Chapdelaine, 616 F.Supp. 522, 526 (D.R.I. 1985)).

As noted above, the second prong of the Terry test requires a showing that "'the action taken [by police] was reasonably related in scope to the circumstances which justified the interference in the first place.'" Taylor, 162 F.3d at 20 (quoting Terry, 392 U.S. at 20). Whether this standard is met

"requires a fact specific inquiry into whether the measures used were reasonable in light of the circumstances that prompted the stop or that developed during its course." United States v. Acosta-Colon, 157 F.3d 9, 15 (1st Cir. 1998).

Here, the initial police action was limited in scope and duration, making it most reasonable under the circumstances. The officers first ordered the defendant out of the vehicle, which is a permissible request after a proper motor vehicle stop. Pennsylvania v. Mimms, 434 U.S. 106 (1977); Maryland v. Wilson, 519 U.S. 408 (1997).

The same analysis applies to the agents' use of handcuffs. The fact that the agents handcuffed the defendant after he was removed from his vehicle does not automatically convert that encounter into a de facto arrest. See United States v. Fornia-Castillo, 408 F.3d 52, 65 (1st Cir. 2005)(holding that neither the use of handcuffs nor the drawing of a weapon turned a Terry stop into a de facto arrest since the stop took place on a busy street, with a high volume of traffic and the officer was alone); United States v. Quinn, 815 F.2d 153, 157 n.2 (1st Cir. 1987); see also United States v. Zapata, 18 F.3d 971, 976 (1st Cir. 1994)(stating that the right to make an investigatory stop "'necessarily carries with it the right use some degree of physical coercion.'"). Police officers engaged in a lawful stop are permitted to take measures, including the use of handcuffs,

to reasonably protect themselves and others from harm. See Acosta-Colon, 157 F.3d at 18 (recognizing that handcuffs do not necessarily convert an investigatory stop into a de facto arrest, although ruling in this particular case, handcuffing the defendant pursuant to procedure as opposed to in response to safety concerns, in conjunction with a detention that caused defendant to miss his flight, did amount to a de facto arrest); United States v. Hamlin, 319 F.3d 666, 671-72 (4th Cir. 2003)("[T]he use of handcuffs did not convert the encounter into a custodial arrest because the use was reasonably necessary to protect the officer's safety.").

Such protective measures are especially necessary when the defendant is suspected of engaging in drug distribution activities, because "law enforcement officers know from experience that firearms are often found in the presence of illegal drugs." Jackson, 918 F.2d at 240 (citing United States v. Walters, 904 F.2d 765, 769 (1st Cir. 1990) ("in drug trafficking, firearms have become 'tools of the trade'")).

In this case, as stated in section IA, TFA Naylor received detailed information regarding the defendant's drug dealing that was to a large extent corroborated by events. In addition, the officers conducting the stop observed the defendant attempt to flee from Officer Davis as he activated his lights. See Wardlow, 528 U.S. at 124 ("Headlong flight - wherever it occurs - is the

consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."); United States v. Goncalves, No. 06-062ML (D.R.I. January 17, 2007) (order denying motion to suppress). At a minimum, the officers had reasonable and articulable suspicion that justified the stop of the defendant's vehicle.

Furthermore, the agents were well within the boundaries of reasonable behavior in handcuffing the defendant. See United States v. Ivery, 427 F.3d 69, 73 (1st Cir. 2005) ("[T]he circumstances under which the officers acted are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training."). The defendant had tried to escape. See Lee, 317 F.3d at 31-32 (noting that attempted flight made a "world of difference" in the analysis of whether a Terry stop was transformed into a defacto arrest). The defendant's actions in conjunction with the information regarding the defendant's drug dealing warranted the handcuffs. To not take such a simple precaution as handcuffing the defendant during a Terry stop such as this would have been rash and foolish.

**C. Even if the Court Finds That The Agents Did Not Have Probable Cause to Arrest Prior to the Traffic Stop of the Defendant's Vehicle the Agents Had Probable Cause to Arrest the Defendant After the Traffic Stop.**

Defendant Saccoccia arrested the defendant after observing the brick of cocaine on the floor of his vehicle. Certainly,

after stopping the defendant, and observing what appeared to be a brick of cocaine on the floor behind the passenger seat, Detective Saccoccia had sufficient knowledge to lead a prudent person to believe that the defendant was committing or had committed an offense. See Link, 238 F.3d at 109.

## II. THE SEARCH OF THE DEFENDANT'S VEHICLE AND RESULTING DISCOVERY OF THE ADDITIONAL NARCOTICS WAS LAWFULLY CONDUCTED PURSUANT TO THE AUTOMOBILE EXCEPTION.

The same corroborated informant information that provided the officers with the probable cause to arrest the defendant justified the warrantless search of the defendant's vehicle. Once the officers had probable cause to believe that the vehicle the defendant was driving contained contraband, they were free to search it without first obtaining a warrant. United States v. Lopez, 380 F.3d 538, 543 (1st Cir. 2004). Furthermore, the permissible scope of that search included not only the vehicle itself, but also any containers found within, such as the safe. California v. Acevedo, 500 U.S. 565, 579-80 (1991).

The automobile exception justifies a warrantless search of a motor vehicle regardless of whether there was time to obtain a warrant, or whether the search occurred after the vehicle was in police custody. "[S]o long as the vehicle search is supported by probable cause, no particular exigency (beyond the inherent mobility of any motor vehicle) need exist." United States v. Panitz, 907 F.2d 1267, 1271 (1st Cir. 1990). That is, although

the officers might have had time to secure a warrant, there is no requirement that they do so. See id. at 1271 ("the existence of probable cause justifies a warrantless seizure and reasonable search of a motor vehicle lawfully stopped in transit or parked in a public place, whether or not exigent circumstances prevailed at either the time of the seizure or the time of the search."). In fact, "law enforcement personnel who have probable cause to believe there is contraband in an automobile may nevertheless conduct a warrantless search, 'even after [the vehicle] has been impounded and is in police custody.'" United States v. Chapdelaine, 616 F.Supp. 522, 529 (D.R.I. 1985) (quoting Michigan v. Thomas, 458 U.S. 259, 261 (1982)), aff'd, 795 F.2d 75 (1st Cir. 1986); see United States v. McHugh, 769 F.2d 860 (1st Cir. 1985) (upholding a search of a vehicle one week after its seizure).

In the case at hand, the defendant contests the officers' search of the vehicle at the scene of the traffic stop[3]. He

---

[3] The "brick" of cocaine was observed by Detective Saccoccia while he was standing outside of the vehicle and looking through the rear passenger window. This observation was not a search or a seizure. See Texas v. Brown, 460 U.S. 730, 740 (1983) ("There is no legitimate expectation of privacy . . . shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.") (citations omitted). Furthermore, the fact that the brick of cocaine was wrapped in a blue plastic does not negate its significance for purposes of probable cause. See id. at 743 ("The fact that [the officer] could not see through the opaque fabric of the balloon is all but irrelevant: the distinctive character of the balloon itself spoke volumes as to

argues that the officers should have obtained a warrant prior to searching his vehicle; however, the law, as discussed above, does not support the defendant's contention. Quite simply, because the officers had probable cause to believe there was contraband in the vehicle, they were entitled to search the defendant's vehicle pursuant to the automobile exception.

Furthermore, the automobile exception extends to the more thorough search of the vehicle conducted after the discovery of the brick. See Panitz, 907 F.2d at 1271; McHugh, 769 F.2d at 865 (automobile exception justified a search one week after seizure of the vehicle); Chapdelaine, 616 F.Supp. at 528 ("A search for cocaine [pursuant to the automobile exception] could logically take the officers into every nook and cranny of a vehicle, including the luggage."). This search resulted in the discovery of 17 additional bags of cocaine packaged for distribution and five cellular phones. TFA Naylor had been told that the defendant had two kilograms of cocaine, and only one kilogram had been found. The agents had every reason to believe there was more cocaine in the vehicle, or alternatively in the defendant's house.

## III. THE DEFENDANT VOLUNTARILY CONSENTED TO A SEARCH OF HIS RESIDENCE.

"In order to be effective, a person's consent to a search

---

its contents - particularly to the trained eye of the officer.").

must be freely and voluntarily given." United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999). "Voluntariness turns on a number of factors, including the person's 'age, education, experience, intelligence, and knowledge of the right to withhold consent.'" Id. (quoting United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993)). "The court can also consider 'whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances.'" Id.; cf. United States v. Blais, 98 F.3d 647, 650-51 (1st Cir. 1996) ("[W]hile the failure to inform an individual that he has a right to withhold consent is a factor to be weighed in determining the issue of voluntariness, such a failure does not preclude a finding of valid consent.").

In this case, the defendant argues that his consent to search was involuntary because he was told that his wife would be charged with possession of any drugs found in the house. This assertion is not true. At least two agents were present when the defendant gave consent to search his home, and neither of them heard the defendant's wife threatened.

Even if the defendant's contention were true, it does not vitiate his consent. In Jackson, 918 F.2d at 242, while addressing the voluntariness of the defendant's confession, the First Circuit recognized that a voluntariness determination

requires the court to "look at the totality of the circumstances, including any promises or threats made by police officers or the prosecution, in order to see whether the will of the accused was overborne."

At the time the defendant gave consent, the defendant was 29 years old. He had already had his Miranda rights read to him, and he had waived those rights. The defendant had been cooperative with the agents and had given a statement about his cocaine delivery. Furthermore, the defendant's actions themselves, i.e., directing the agents to his keys, and then to the bathroom once at his house, all weigh in favor of a determination of voluntariness. Considering all of the factors, the Court should find the defendant's consent voluntary. See, e.g., United States v. Mitchell, 209 F.3d 319, 324 (4th Cir. 2000)(finding defendant's consent to be voluntary in light of his age, past arrests, and willingness to tell the police exactly where they could find the firearm even though defendant was arrested at gunpoint, not given Miranda warnings and not advised of his right to refuse consent).

**CONCLUSION**

For the reasons set forth above, the United States respectfully requests that this Honorable Court deny the defendant's Motion to Suppress.

Respectfully submitted,

UNITED STATES OF AMERICA
By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ SANDRA R. BECKNER
SANDRA R. BECKNER
Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
email sandra.beckner@usdoj.gov

CERTIFICATION OF SERVICE

On January 31, 2007, I caused the within "Government's Response in Opposition to Defendant's Motion to Suppress" to be filed electronically and it is available for viewing and downloading from the ECF system.

Electronic notification:

Mr. Anthony M. Traini, P.C.
Attorney at Law
56 Pine Street
Providence, Rhode Island 02903

/s/ SANDRA R. BECKNER
SANDRA R. BECKNER
Assistant U. S. Attorney
NY Bar
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
sandra.beckner@usdoj